**Rick CLARK, Indiana State University, and the Indiana State University Board of Trustees, Appellants,**

v.

**Carol A. WIEGAND, Appellee.**

**No. 77S01–9307–CV–802.**

Supreme Court of Indiana.

July 23, 1993.

Daniel D. Trachtman, Mary L. Titsworth, Wooden McLaughlin & Sterner, Indianapolis, for appellants.

T. Reg Hesselgrave, Moore & Gaston, Indianapolis, for appellee.

DICKSON, Justice.

Plaintiff-appellee Carol Wiegand initiated this negligence action against defendants-appellants Rick Clark, Indiana State University, and the Indiana State University Board of Trustees (collectively "ISU") for knee injuries sustained when a fellow student in her college judo[1] class threw her to the mat. The ensuing jury trial resulted in a $50,000 verdict for the plaintiff. ISU appealed the trial court's denial of its two motions for judgment on the evidence. In an unpublished memorandum decision, the Court of Appeals reversed the trial court and ordered the entry of judgment on the evidence in favor of ISU, 606 N.E.2d 895.

The plaintiff's petition for transfer argues in part that the Court of Appeals misstated the record[2] and erroneously re-

---

1. Judo is "a sport developed from jujitsu that emphasizes the use of quick movement and leverage to throw an opponent." *Webster's Ninth New Collegiate Dictionary* (1987).

2. For example, the reasoning employed by the Court of Appeals was substantially predicated on the following assertion of fact set forth in its decision:

The syllabus explained that judo was a physical contact sport, and although injuries had rarely occurred in his class, the syllabus cautioned that judo techniques could aggravate a pre-existing injury and requested that students with physical problems notify Clark [the instructor].

*Clark v. Wiegand* (filed Jan. 12, 1993), Ind.App., No. 77A01–9208–CV–259, slip op. at 3 [606 N.E.2d 895 (Table)]. The syllabus itself, identi-

weighed and considered the evidence favorable to the appellant. We agree and grant transfer.

On appeal, the defendants contend that the trial court erred in denying their motions for judgment on the evidence and assert that the undisputed facts produce the single inference that the plaintiff incurred the risk of her injury as a matter of law. The plaintiff responds that the evidence was in conflict and that, when properly viewed as favorable to her, supports the judgment of the trial court.

■ Motions for judgment on the evidence are authorized by Indiana Trial Rule 50(A), which provides in relevant part:

Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

In reviewing a trial court's ruling on a motion for judgment on the evidence, the appellate court must consider only the evidence and reasonable inferences most favorable to the non-moving party. *Sipes v. Osmose Wood Preserving Co.* (1989), Ind., 546 N.E.2d 1223, 1224; *Jones v. Gleim* (1984), Ind., 468 N.E.2d 205, 206. If there is any probative evidence or reasonable inferences that would allow reasonable persons to differ, then judgment on the evidence is improper. *Wilson v. Redinbo* (1988), Ind., 519 N.E.2d 568, 569; *Jones*, 468 N.E.2d at 207.

■ Urging that incurred risk was conclusively established, the defendants emphasize evidence that the plaintiff had experienced judo class injuries prior to the incident at issue in this action. The plaintiff argues that these prior occasions consisted solely of "a couple" of times when she had the wind knocked out of her, and

that although she understood and appreciated the risk of having the wind knocked out of her, she did not understand and appreciate the risk of suffering a serious knee injury.

■ The doctrine of incurred risk consists of the following components:

It involves a mental state of venturousness on the part of the actor, and demands a subjective analysis into the actor's actual knowledge and voluntary acceptance of the risk. By definition ... the very essence of incurred risk is the conscious, deliberate and intentional embarkation upon the course of conduct with knowledge of the circumstances. It requires much more than the general awareness of a potential for mishap. Incurred risk contemplates acceptance of a specific risk of which the plaintiff has *actual* knowledge.

*Beckett v. Clinton Prairie Sch. Corp.* (1987), Ind., 504 N.E.2d 552, 554, *quoting Power v. Brodie* (1984), Ind.App., 460 N.E.2d 1241, 1243 (emphasis in original, citations omitted). It is not enough that a plaintiff have merely a general awareness of a potential for mishap, but rather, the defense of incurred risk demands a subjective analysis focusing upon the plaintiff's actual knowledge and appreciation of the specific risk and voluntary acceptance of that risk. *Get-N-Go, Inc., v. Markins* (1989), Ind., 544 N.E.2d 484, 486, *aff'd on reh'g* (1990), Ind., 550 N.E.2d 748.

Applying our standard of review, the facts favorable to the plaintiff as the non-moving party show that in 1987 she was a student at Indiana State University pursuing a degree in fitness management and had enrolled in a judo course. At the beginning of each class period, the instructor, Clark, explained and demonstrated various judo throws and techniques. The students were then instructed to practice with each other while Clark supervised. Although Clark would sometimes pair students at the

---

fied as Exhibit A, Record at 334–35, makes no mention of judo being a "physical contact sport," the frequency of injury, or the potential aggravation of pre-existing injuries. The sole

reference to the physical nature of judo is found in this sentence: "If you have any physical problems which may cause you difficulty in this class, notify the instructor." Record at 334.

beginning of class period, he told the class to switch partners and practice with other class members. During one class in November, the plaintiff had the wind knocked out of her after a classmate, Tim Jordan, threw her while practicing a technique. The plaintiff testified that Jordan, a 260-pound member of the university football team, was "very aggressive" in practice. Record at 400–01. He had knocked the wind out of her during judo class more than once. Following the November incident, the plaintiff spoke to Clark after class, mentioning that she "was afraid" of Jordan. Clark responded that she "would have to learn how to deal with it." Record at 398–99. During class on December 2, 1987, Jordan, attempting to apply a newly-taught technique, threw the plaintiff, resulting in a disabling injury to the central ligament of her left knee. The plaintiff testified that by December, 1987, she was aware of the possibility that she could have the wind knocked out of her in judo class but that it had not occurred to her that she could have a serious injury. Record at 447–48, 456.

Citing *Forrest v. Gilley* (1991), Ind.App., 570 N.E.2d 934, and *Mauller v. City of Columbus* (1990), Ind.App., 552 N.E.2d 500, ISU contends that the plaintiff's experiences of getting the wind knocked out of her constitute conclusive proof that she understood and appreciated the risk of injury and thus incurred the risk of ISU's negligent supervision as a matter of law. In *Forrest*, the Court of Appeals reversed the denial of summary judgment and found incurred risk as a matter of law. It concluded that the plaintiff's prior fall from a horse provided conclusive proof that she "understood and appreciated that she could fall and be injured." *Forrest*, 570 N.E.2d at 936. In *Mauller*, a grant of summary judgment was upheld because the uncontradicted evidence established that the plaintiff voluntarily accepted the general risk of injury from sliding into home plate when displaced dirt created a depression near the plate.

ISU also contends that the plaintiff's incurred risk is established from discussions between Clark and the plaintiff at the beginning of the semester regarding risks associated with preexisting injuries. As to whether such warnings or statements occurred, however, there is conflicting evidence.

As instructed by *Get–N–Go*, 544 N.E.2d at 486, and *Beckett*, 504 N.E.2d at 555, a general awareness of a potential for mishap is not enough to constitute incurred risk, and we must focus upon whether the plaintiff had actual knowledge, appreciation, and voluntary acceptance of the specific risk involved. ISU argues that the specific risk is that of any injury, regardless of severity, from being thrown in judo class. The present facts are distinguishable from those in *Forrest* and *Mauller*. In *Forrest*, an intoxicated person, inexperienced with horses, fell from a horse while riding bareback, remounted the horse, and fell again when the horse began running. The specific risk of falling from a horse necessarily embraces a considerable range of potentially severe injuries. The injuries in *Mauller* resulted when the cleats on the plaintiff's softball shoes caught under the edge of a protruding home plate causing a fracture and dislocation of her lower leg and ankle. Such injuries are clearly within the risk incurred.

In contrast, the specific risk of harm from the classroom practice of a judo technique upon which instruction had been given does not include a comparable prospect of severe or specific injury. Whether under these circumstances a knee ligament injury was within the plaintiff's actual knowledge, appreciation, and voluntary acceptance is a factual matter not easily susceptible to determination as a matter of law. In addition, the evidence presents the issue of voluntariness in view of the plaintiff's enrollment in the college judo course for credit toward graduation and her class instructor's directions to "learn how to deal with" Tim Jordan as a practice partner. As to the questions of the identification of the specific risk incurred and the voluntariness of its acceptance, there is probative evidence and inferences that would allow reasonable persons to differ.

Considering only the evidence and reasonable inferences most favorable to the non-moving party, as we must, we decline to reverse the decisions of the trial court denying the defendants' motions for judgment on the evidence.

Transfer is granted. The judgment of the trial court is affirmed.

DeBRULER, GIVAN and KRAHULIK, JJ., concur.

SHEPARD, C.J., dissents in separate opinion.

SHEPARD, Chief Justice, dissenting.

The majority opinion omits a fair amount of undisputed evidence about what Carol Wiegand knew when she decided on December 2, 1987, to engage in judo with Tim Jordan. Much of this evidence was Carol Wiegand's own testimony. I recite it here to give the reader a fuller picture of Wiegand's decision.

I begin where Justice Dickson begins. Carol Wiegand was not a mathematics student enrolled in a compulsory physical education class. She was a competitive athlete of considerable experience. She played varsity volleyball, varsity softball, and reserve basketball in high school. Moving on to Vincennes University, Wiegand earned an athletic scholarship for her volleyball prowess. She played varsity volleyball for Vincennes and took weight training there, as she had in high school. In short, Wiegand was an experienced athlete, both by academic training and regular competitive participation.

This history suggests another dimension omitted from the majority opinion, which does recite that Jordan was a 260–pound member of the ISU football team. The reader should not be left to suspect that Wiegand was a violet among mammoths. Her years of weight-lifting training led her to describe her ability as "fairly high." Record at 441–42. Wiegand told the jury about her participation in a body-building competition, record at 440, and said that at the time she was taking judo she could lift 150 pounds of free weights. Record at 442.

There is moreover little ambiguity about Wiegand's knowledge that energetic athletic activity could lead to injury. The Court's opinion declares that whether "under these circumstances a knee ligament injury was within plaintiff's actual knowledge, appreciation, and voluntary acceptance is a factual matter," op. at 919, but it does not reveal that Wiegand had already experienced an athletic injury before she ever made the decision to enroll in judo. During Wiegand's second year at Vincennes University, about twelve months or so before being injured at judo, Wiegand fell while playing volleyball and injured her right knee. This injury was sufficiently serious that it required arthroscopic surgery. Record at 388, 442.

Case law cited with apparent acceptance in the Court's opinion, *Forrest*, 570 N.E.2d 934, and *Mauller*, 552 N.E.2d 500, rejects the notion that incurred risk requires that the venturer "had prescience that the particular accident and injury which in fact occurred was going to occur." *Forrest*, 570 N.E.2d at 936. The tightness with which such a rule need be applied is of little moment in this case. The Court expresses open-mindedness about whether Wiegand appreciated the possibility of incurring a knee injury while engaged in judo. I say that a university junior, a fitness major who experienced a knee injury playing a ballgame in which people sometimes fall while jumping, should be thought of as a person who appreciates the possibility of knee injuries (and a good deal else) in playing a game in which the object is to pick up your partner's body and throw it on the floor.

But did Wiegand appreciate the possibility of being injured while practicing judo *with Tim Jordan?* The Court's opinion mentions that Wiegand had endured several "very aggressive" experiences with Jordan and that these caused her to fear practicing with him. It omits, however, Wiegand's testimony at trial acknowledging that these experiences caused her to fear the possibility of being injured while practicing with Jordan:

Q. Had you had the wind knocked out of you a couple of times in class ...

A. Yes, sir.

Q. ... before the day that we're talking about?

A. Yes, sir.

Q. And so, as of the beginning of December, 1987, you knew that an injury like getting the wind knocked out of you or perhaps another kind of injury was a possibility?

A. He did not explain that to us, sir, at the beginning of class, no.

Q. Did you know it?

A. Not until I was ... not until I had the wind knocked out of me.

Q. But after you had the wind knocked out of you, you knew it, is that right?

A. Yes, sir.

Record at 447–48.

Finally, the Court concludes that whether Wiegand voluntarily accepted the risk was an open question, citing the fact that she was enrolled in the judo course to earn graduation credit and her instructor's statement that being paired with Jordan was something to "learn to live with." This should not be taken as an indication that judo was required for graduation. The record shows that judo was an elective among others available to fitness majors. Wiegand testified at trial that taking judo was a personal choice: "I could take judo, if I wanted to take it and I did want to take it." Record at 392. As for whether the instructor assigned Wiegand and Jordan as partners on December 2, 1987, the record is equally direct. Wiegand testified at trial that after any initial pairing by the instructor at the beginning of class, "He would just say, 'switch partners.' And then somebody would just grab somebody." Record at 396. Wiegand testified that on December 2nd, she had practiced with about four partners before she joined up with Jordan. We may not know whether this pairing was Wiegand's choice or Jordan's choice, or both. I think we can say that the record contains nothing demon-strating that it was a choice made by the instructor or the university trustees.

It has long been the rule that one may obtain judgment on the evidence where the evidence is not conflicting and is susceptible to only one inference, supporting judgment for the movant. To my mind, Carol Wiegand's own version of the events, recited above, required judgment for the defendants as a matter of law. The abundance of the evidence on this point might lead alarmists to conclude that the Supreme Court has abolished Trial Rule 50 by today's decision.

I neither discern such a purpose nor harbor such fear. Decisions on points like the one presented here are among the most fact-bound decisions judges make. The trial judge concluded the facts did not constitute assumption of risk as a matter of law. Three members of the Court of Appeals concluded they did. Four members of this Court now say they did not.

No new law here, just an exercise in error-correcting by the court of last resort, error being in the eye of the beholder, who says here there was none. So let it be.