Rebecca J. MARK, Appellant–Plaintiff,

v.

Kyle MOSER, Appellee–Defendant.

No. 29A02–0010–CV–623.

Court of Appeals of Indiana.

April 19, 2001.

Joseph A. Christoff, Konrad M.L. Urberg, Christoff & Christoff, Fort Wayne, IN, Attorneys for Appellant.

Steven K. Huffer, Derek L. Mandel, Huffer & Weathers, P.C., Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge

Today we are called upon to clearly define the standard of care one competitor owes another in a sporting event. Although this court may have tangentially addressed the issue in the past, there has been no case since the adoption of the Comparative Fault Act where an in-depth analysis was warranted. Thus, the precise issue we must decide is whether a participant in an athletic activity may recover in tort for injury as the result of another participant's negligent conduct.

### FACTS

The uncontroverted facts are that on September 7, 1997, Rebecca Mark (Rebecca) and Kyle Moser (Kyle) were co-participants in a triathlon competition in Marion County, which consisted of three events, swimming, bicycling, and running. Before the competition, each triathlon participant agreed to abide by the rules adopted by USA Triathlon. In addition, all the participants signed an entry form, which included a waiver provision and release from liability.

During the bicycling leg of the triathlon, Kyle was riding on the left side of Rebecca and cut in front of her. As a result, the two bicycles collided and Rebecca was hospitalized with serious injuries. Kyle was subsequently disqualified for violating the USA Triathlon rule against endangerment. That rule provides: "No cyclist shall endanger himself or another participant. Any cyclist who intentionally presents a danger to any participant or who, in the judgment of the Head Referee, appears to present a danger to any participants shall be disqualified." Record at 115. The triathlon referee, Ardith Spence, stated that Kyle's conduct was not considered intentional; rather, he was disqualified for violating the rule "because, by moving over, an accident occurred." R. at 111.

On June 7, 1998, Rebecca filed a two-count complaint against Kyle. In Count I, Rebecca alleged that the collision was caused by Kyle's negligence and, in the alternative, in Count II, Rebecca alleged that Kyle acted intentionally, recklessly and willfully in causing her injuries. In response, on September 29, 2000, Kyle filed a motion for summary judgment as to both counts of Rebecca's complaint. Specifically, Kyle argued that Rebecca was barred from recovering on a negligence theory and, instead, asserted that she was required to establish that he intentionally, recklessly, willfully, or wantonly caused her injuries. In addition, Kyle argued that there was no evidence indicating that he had intentionally or recklessly caused the collision between the two bicycles.

The trial court held a hearing on Kyle's motion on June 7, 2000. Thereafter, on August 3, 2000, the trial court granted summary judgment as to Count I of Rebecca's complaint and denied it as to Count II. Rebecca now appeals the trial court's judgment regarding the negligence count.

### DISCUSSION AND DECISION

#### I. Standard of Review

The standard of review of a summary judgment is well settled. This court

applies the same standard as the trial court. *USA Life One Ins. Co. v. Nuckolls,* 682 N.E.2d 534, 537 (Ind.1997). We do not weigh the evidence designated by the parties. Instead, we liberally construe the evidence in the light most favorable to the non-moving party. *Id.* Summary judgment is appropriate only if the pleadings and the evidence show both the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Butler v. City of Indianapolis,* 668 N.E.2d 1227, 1228 (Ind.1996). Where material facts conflict, or undisputed facts lead to conflicting material inferences, summary judgment is inappropriate. *Id.*

## II. The Current State of the Law

### A. Indiana Law

Many people might think that Rebecca's claim would be barred because she in some way incurred, or assumed, the risk of injury by participating in the sporting event. However, under present Indiana law that would not necessarily be the case if the standard of care was negligence. On January 1, 1985, Indiana adopted the Comparative Fault Act (the Act). IND.CODE § 34–51–2–1 to –19. The Act was intended to ameliorate the harshness of the then prevailing common law doctrine of contributory negligence. *Baker v. Osco Drug, Inc.,* 632 N.E.2d 794, 797 (Ind.Ct.App.1994). Under the common law rule, a slightly negligent plaintiff was precluded from recovery of any damages, even against a highly culpable tortfeasor. *Id.* In contrast, under the Act, if a plaintiff's conduct satisfies the statutory definition of "fault," he will be permitted to recover damages, but those damages will be reduced by his proportion of fault. *Id.* However, if the plaintiff's percentage of fault is assessed at greater than fifty percent, his recovery will still be completely barred. *Id.* For purposes of defining comparative fault, the term "fault" includes "any act or omission that is negligent, willful, wanton, reckless, or intentional towards the person or property of others. The term also includes unreasonable assumption of risk not constituting an enforceable express consent, incurred risk, and unreasonable failure to avoid an injury or to mitigate damages." I.C. § 34–6–2–45(b). This inclusion of "incurred risk" in the definition of fault abolishes incurred risk as a complete bar to recovery and establishes that the fault of each party should be apportioned. *Baker,* 632 N.E.2d at 797. Thus, under Indiana law, if we adopt negligence as the standard of care between co-participants in a sporting event, it would be a question of fact for the jury to decide whether the plaintiff in any way incurred the risk of harm but is, nevertheless, entitled to recover for his injury.

Our supreme court has not specifically addressed the standard of care between co-participants in athletic events. However, it has addressed the appropriate standard of care owed by an educational institution and its representatives to students for injuries sustained while playing campus sports. In this context, the court has adopted a negligence standard. *See Beckett v. Clinton Prairie Sch. Corp.,* 504 N.E.2d 552, 554 (Ind.1987) (holding that school personnel have a duty to exercise reasonable care over students participating in a school activity under school supervision, in a case involving a collision between two student baseball players). Our supreme court adopted this standard based on its recognition that there is a well-established "duty on the part of school personnel to exercise ordinary and reasonable care for the safety of children under their authority." *Beckett,* 504 N.E.2d at 553; *c.f. Brewster v. Rankins,* 600 N.E.2d 154, 158 (Ind.Ct.App.1992) (holding that

while school authorities have a duty to exercise reasonable care for the safety of children under their tutelage, they have no duty to prevent a student from injuring other players while practicing his golf swing at home). According to the court, whether school personnel exercised their duty with the level of care of an ordinary prudent person under the same or similar circumstances is generally a factual question for the determination of the jury. *Beckett*, 504 N.E.2d at 554.

■ Our supreme court has also recognized, however, that if the student athlete can be shown to have incurred the risks inherent in the sports event, this acts as a potential bar to recovery. *Id.; see also Clark v. Wiegand*, 617 N.E.2d 916, 919 (Ind.1993) (holding that the question of whether a student in a university judo class incurred the risk of injury from another student so as to bar recovery from the university was a question for the jury). According to the *Beckett* court, for the "doctrine of incurred risk" to affect the plaintiff's likelihood or percentage of recovery, it is not enough that the plaintiff merely has a general awareness of a potential for mishap in engaging in the particular sports activity. *Id.* Rather, the doctrine involves a subjective analysis focusing upon the plaintiff's actual knowledge and appreciation of the specific risk and voluntary acceptance of that risk. *Clark*, 617 N.E.2d at 919 (stating that whether the possibility of sustaining a knee ligament injury while participating in a judo class "was within the plaintiff's actual knowledge, appreciation, and voluntary acceptance, is a factual matter not

easily susceptible to determination as a matter of law").[1]

In *Duke's GMC v. Erskine*, 447 N.E.2d 1118, 1118 (Ind.Ct.App.1983), a panel of this court addressed the situation where a sports participant sued for injuries caused by another player. *Duke's GMC* involved a golfer, Erskine, who sued for loss of an eye from being struck by a golf ball at a country club. *Id.* In addition to being decided prior to Indiana's adoption of the Comparative Fault Act, *Duke's GMC* is distinguishable from the case at bar because the court was not confronted with the standard of care between sports co-participants and because Erskine sued the corporation that paid the dues of its president who hit the golf ball causing the injury, rather than suing the president himself. *Id.* Specifically, in *Duke's GMC*, this court was called upon to decide whether the trial court erred in admitting certain evidence and in the instructions it gave to the jury. In addressing whether the trial court's instruction regarding incurred risk was erroneous, this court approved the parties' assertion that a golfer could not incur the risk of another golfer's negligence as a matter of law. This court then discussed the instruction based on a negligence standard, but it never addressed the standard of care one competitor owes another in a sporting event. However, when discussing the appropriateness of the trial court's instructions regarding damages, the *Duke's GMC* court did examine how violations of the rules of sport affect the negligence analysis. In so doing, this court recognized that the "rules of sport are at least an indicia of the standard of care which players owe each other," and concluded that "[w]hile a viola-

---

1. For another case where a student brought suit against the school corporation for injuries caused by a fellow student during a sports event, see *Huffman v. Monroe County Community Sch. Corp.*, 588 N.E.2d 1264 (Ind.1992).

In that case, the plaintiff sustained head and shoulder injuries when a fellow student struck her in the back of the head with a shot put during a track meet. *Id.* at 1264.

tion of those rules may not be negligence per se, it may well be evidence of negligence."[2] *Id.* at 1124.

■ Thus, under the current state of Indiana law, in actions for sports-related injuries against school authorities, rather than against a co-participant, liability will attach in the event that negligence is shown. We note, however, that the plaintiff's negligence claim is subject to the defense of incurred risk, which requires the defendant to establish that the plaintiff had actual knowledge of the risk that resulted in his injury. Should the defendant carry his burden of proof on this defense, the plaintiff's recovery will be reduced or eliminated depending on the degree of the plaintiff's fault.

### B. Law in Other Jurisdictions

The authority from other jurisdictions is instructive with regard to the standard of care to be applied between co-participants in a sports activity. Other jurisdictions have generally taken one of two approaches to this issue, and have adopted either a negligence or recklessness standard. They have also recognized two principle defenses, contributory negligence and assumption of risk.

Arizona, Nevada, and Wisconsin judge sports injury cases between co-participants according to an "ordinary care" or negligence standard. *See Estes v. Tripson,* 188 Ariz. 93, 932 P.2d 1364, 1366 (Ariz.Ct.App. 1997); *Auckenthaler v. Grundmeyer,* 110 Nev. 682, 877 P.2d 1039, 1043 (1994); *Lestina v. West Bend Mut. Ins. Co.,* 176 Wis.2d 901, 501 N.W.2d 28, 33 (1993). The primary argument for adhering to the negligence standard is the belief that this standard is flexible enough to be applied to a wide range of situations because it only requires that a person exercise ordinary care under the circumstances. *See Auckenthaler,* 877 P.2d at 1043; *Lestina,* 501 N.W.2d at 33. Thus, "within the factual climate of . . . sporting events, the question posed is whether the defendant participated in a reasonable manner and within the rules of the game or in accordance with the ordinary scope of the activity." *Auckenthaler,* 877 P.2d at 1043 (citing *Lestina,* 501 N.W.2d at 33).

The majority of other states have adopted a "reckless or intentional conduct" or a "willful and wanton or intentional misconduct" standard. These states include California, Connecticut, Illinois, Kentucky, Louisiana, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, New Mexico, New York, Ohio, and Texas. *See Knight v. Jewett,* 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696, 711 (1992) (applying a recklessness standard to an injury in an informal game of coed football); *Jaworski v. Kiernan,* 241 Conn. 399, 696 A.2d 332, 339 (1997) (holding that a recklessness or intentional misconduct standard should be used in a case involving a recreational soccer game); *Hoke v. Cullinan,* 914 S.W.2d 335, 339 (Ky.1995) (applying a recklessness standard with respect to an injury sustained in a doubles tennis match); *Picou v. Hartford Ins. Co.,* 558 So.2d 787, 790 (La.Ct.App.1990) (applying recklessness as the standard for injuries sustained during a softball game); *Gauvin v. Clark,* 404 Mass. 450, 537 N.E.2d 94, 96 (1989) (adopting a "reckless disregard of safety" standard in a case involving a college hockey game); *Ritchie–*

---

**2.** The parties dispute whether the court in this case proceeded under a standard of negligence or reckless misconduct. Appellant's brief at 8; Appellee's brief at 4–5. While the standard is unclear, it appears from the court's holding and analysis of how violations of the rules of sport affect the negligence analysis, that it permitted the case to proceed under a negligence standard. *Duke's GMC,* 447 N.E.2d at 1124.

*Gamester v. City of Berkley,* 461 Mich. 73, 597 N.W.2d 517, 518 (1999) (holding that co-participants owe each other a duty not to engage in reckless misconduct in a case involving a collision between two recreational skaters); *Dotzler v. Tuttle,* 234 Neb. 176, 449 N.W.2d 774, 779 (1990) (adopting a recklessness standard with respect to injuries sustained in a "pickup" basketball game); *Crawn v. Campo,* 136 N.J. 494, 643 A.2d 600, 601 (1994) (adopting a "reckless disregard for the safety of others" standard in a case involving a "pickup" softball game); *Kabella v. Bouschelle,* 100 N.M. 461, 672 P.2d 290, 293 (N.M.Ct.App.1983) (adopting recklessness as the standard for injuries sustained during an informal game of tackle football); *Turcotte v. Fell,* 68 N.Y.2d 432, 510 N.Y.S.2d 49, 502 N.E.2d 964, 968 (1986) (concluding that a "reckless or intentional" standard applied in a case involving a professional jockey injured during a horse race); *Marchetti v. Kalish,* 53 Ohio St.3d 95, 559 N.E.2d 699, 703 (1990) (applying the recklessness standard to a minor who was injured participating in a recreational game of "kick the can"); *Hathaway v. Tascosa Country Club, Inc.,* 846 S.W.2d 614, 616 (Tex.App.1993) (applying a "reckless or intentional" standard in a case involving an injury suffered during a recreational golf game).

Of those states that have adopted a recklessness or intentional misconduct standard, some, including Illinois and Missouri, have explicitly limited application of this standard to contact sports. *See Pfister v. Shusta,* 167 Ill.2d 417, 212 Ill.Dec. 668, 657 N.E.2d 1013, 1017 (1995) (holding that participants who voluntarily engage in contact sports cannot recover for injuries resulting from the negligence of other players and, instead, must establish willful and wanton or intentional misconduct); *Zurla v. Hydel,* 289 Ill.App.3d 215, 224 Ill.Dec. 166, 681 N.E.2d 148, 152 (1997) (holding that negligence is the appropriate standard of care between co-participants in golf); *Novak v. Virene,* 224 Ill.App.3d 317, 166 Ill.Dec. 620, 586 N.E.2d 578, 579 (1991) (concluding that negligence is the appropriate standard between skiers); *Gamble v. Bost,* 901 S.W.2d 182, 186 (Mo.Ct.App. 1995) (holding that a negligence standard is proper in bowling, a non-contact sport) *trans. denied; Ross v. Clouser,* 637 S.W.2d 11, 14 (Mo.1982) (adopting a recklessness standard for contact sports).[3]

Courts that have departed from the negligence standard and adopted an elevated standard of care in the co-participant context, have recognized public policy justifications for doing so. Specifically, some courts have feared that use of an ordinary negligence standard could result in a flood of litigation. For example, in *Jaworski,* the Supreme Court of Connecticut declined to adopt a negligence standard, acknowledging that:

> If simple negligence were to be adopted as the standard of care, every punter with whom contact is made, every mid-

---

**3.** One critic has noted that a "shortcoming of the recklessness standard is the inconsistent formulas courts have established to define recklessness." Ian M. Burnstein, *Liability For Injuries Suffered In The Course of Recreational Sports: Application of the Negligence Standard,* 71 U. Det. Mercy L.Rev. 993, 1014 (1994). Burnstein points out that the Louisiana Court of Appeals in *Bourque,* 331 So.2d at 43, defined recklessness "in terms of consequences to the victim," whereas the Illinois Court of Appeals in *Nabozny v. Barnhill,* 31 Ill.App.3d 212, 334 N.E.2d 258, 261 (1975), defined it in terms of the "actor's 'reckless disregard' for the safety of other players." *Id.* The New Mexico Court of Appeals in *Kabella,* 672 P.2d at 295, "defined reckless disregard as reckless or willful conduct," and other jurisdictions have used the definition set out in the *Restatement (Second) of Torts* (1965). *Id.*

fielder high sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player tripped would have the ingredients for a lawsuit if injury resulted.

696 A.2d at 338. The *Jaworski* court went on to state that given "the number of athletic events taking place in Connecticut over the course of a year ... such potential for a surfeit of lawsuits ... should not be encouraged." *Id.*

Several courts have also recognized that "fear of civil liability stemming from negligent acts occurring [during] an athletic event could curtail the proper vigor with which the game should be played and discourage individual participation." *Ross,* 637 S.W.2d at 14. The Supreme Court of New Jersey in *Crawn,* noted that "[o]ne might well conclude that something is terribly wrong with a society in which the most commonly-accepted aspects of play— a traditional source of a community's conviviality and cohesion—spurs litigation." 643 A.2d at 600. With the foregoing in mind, the *Crawn* court went on to adopt "the heightened recklessness standard," recognizing this as a "commonsense distinction between excessively harmful conduct and the more routine rough-and-tumble of sports that should occur freely on the playing field and should not be second-guessed in courtrooms." *Id.*

 Apart from policy rationales, some courts have justified adoption of a recklessness or intentional standard of care on the grounds that a participant in a sports activity assumes the risks inherent in that activity. *See, e.g., Knight,* 11 Cal. Rptr.2d 2, 834 P.2d at 712; *Marchetti,* 559 N.E.2d at 703–04; *Turcotte,* 510 N.Y.S.2d 49, 502 N.E.2d at 967; *Ross,* 637 S.W.2d at 14. Assumption of risk can be applied in its primary or secondary sense. *See* Fowler V. Harper et al., *The Law of Torts* § 21.0 (3d ed.1996). Secondary assumption of risk is applied according to a subjective standard. Therefore, "if the plaintiff knows, understands, and appreciates a risk and deliberately encounters it, he assumes that risk in the secondary sense." Heidi C. Doerhoff, *Penalty Box or Jury Box? Deciding Where Professional Sports Tough Guys Should Go,* 64 Mo. L.Rev. 739, 751 (1999). Whether the plaintiff appreciated and was willing to encounter the particular risk is a "factual determination[ ] usually reserved to the jury." *Id.*

 Secondary assumption of risk has been subsumed by comparative fault in many jurisdictions and is no longer a defense. However, New York and California recognize primary assumption of risk as having survived enactment of their comparative negligence statutes. These two states have retained assumption of risk in the sports injury context by recasting it as a no-duty rule. Essentially, under the primary assumption of risk doctrine, a sports participant defendant owes no duty of care to a co-participant with respect to risks that are considered to be within the ordinary range of activity involved in the sport. *See Knight,* 11 Cal.Rptr.2d 2, 834 P.2d at 711; *Turcotte,* 510 N.Y.S.2d 49, 502 N.E.2d at 970. Because primary assumption of risk "is a policy-driven concept that flows from the legal relationship of the parties, not their subjective expectations," it is applied according to an objective, rather than subjective, standard. Doerhoff, *supra,* at 751. Thus, for purposes of determining whether the doctrine negates a defendant's duty of care, thereby barring a plaintiff's action, the plaintiff's "knowledge plays a role but [the] inherency [of the risks involved in the particular sport] is the sine qua non." *Morgan v. State,* 90 N.Y.2d 471, 662 N.Y.S.2d 421, 685 N.E.2d 202, 208 (1997). Whether a duty of care attends the relationship between the parties "is a question of law reserved to the

court." Doerhoff, *supra*, at 751. If no such duty is found to exist, then an action for personal injury will be barred as a matter of law absent evidence of reckless or intentionally harmful conduct. *Turcotte*, 510 N.Y.S.2d 49, 502 N.E.2d at 967.

Courts that have adopted the recklessness or intentional standard have also tended to hold rule violations as an inherent and anticipated part of the game. Burnstein, *supra*, at 993. The Supreme Court of Connecticut has justified this tendency by reasoning that the "normal expectations of participants in contact team sports includes the potential for injuries resulting from conduct that violates the rules of sport." *Jaworski*, 696 A.2d at 337. Thus, "Connecticut, like other jurisdictions that have adopted the reckless or intentional standard of care, allows a participant in a sporting event to escape liability when his conduct is 'part of the game' even though it violates [the] rules" of the sport. Mark M. Rembish, *Liability for Personal Injuries Sustained in Sporting Events After* Jaworski v. Kierney, 18 Quinnipiac L.Rev. 307, 341 (1998).

In sum, the majority of jurisdictions that have considered the issue of the appropriate standard of care between co-participants in sporting activities, have adopted a standard of care that exceeds negligent conduct. The rationale behind this heightened standard of care is the fear of a flood of litigation, the desire to encourage vigorous athletic competition and participation in sporting events, and the perception that risk of injury is a common and inherent aspect of sports and recreational activity.

### C. Analysis

 In determining the appropriate standard of care between co-participants in sporting activities in Indiana, we are mindful that in Indiana, as in the rest of the United States, participation in recreational sports has become an increasingly popular leisure time activity. Indeed, over the last decade, more Americans than ever before "have joined recreational softball, basketball, football [and] other types of sports leagues," and there has also been a dramatic increase in participation in high school and college organized sports. Burnstein, *supra*, at 993. Our legislature also emphasized and endorsed the growing importance of sporting and recreational activities in Indiana, when it enacted a statute specifically immunizing landowners from liability if they have opened their property for recreational use. *See* Ind. Code § 14–22–10–2.[4]

After reviewing the decisions of other jurisdictions that have considered this issue, we are convinced that a negligence standard would be over-inclusive. Specifically, we believe that adopting a negligence standard would create the potential for mass litigation and may deter participation in sports because of fear of incurring liability for the injuries and mishaps incident to the particular activity. Further, we believe that the duty of care between co-participants in sports activities is sufficiently distinguishable from Indiana cases where a student athlete sues an educational institution or its representatives, to merit a heightened standard of care. Specifically, application of a negligence

---

**4.** The Indiana Recreational Use Statute provides that the owner of premises used for recreational purposes, such as swimming, camping, hiking, and sightseeing, does not assume responsibility or incur liability, for personal injury or property damage caused by an action or failure to act of persons using the premises. I.C. § 14–22–10–2. Baseball and sledding are among the sporting activities that have been recognized as being covered by the Recreational Use Statute. *See Cunningham v. Bakker Produce, Inc.*, 712 N.E.2d 1002 (Ind.Ct.App.1999), *trans. denied; Civils v. Stucker*, 705 N.E.2d 524 (Ind.Ct.App.1999).

standard is justified where a student athlete sues a school or its representatives because there is a well-established duty on the part of such institutions and their personnel to exercise ordinary and reasonable care for the safety of those under their authority. *See Beckett*, 504 N.E.2d at 553. However, no such analogous authority or responsibility exists between co-participants in sporting events, and therefore, we are not compelled to adopt a similar standard in this context.[5] Finally, as a matter of policy, we prefer to avoid the need to hold a jury trial to determine whether the plaintiff incurred the risk of injury in every case involving a sports injury caused by a co-participant. We can prevent this necessity by adopting an objective primary assumption-of-risk doctrine and a standard of care greater than negligence.

■■■■ Accordingly, we hold that voluntary participants in sports activities assume the inherent and foreseeable dangers of the activity and cannot recover for injury unless it can be established that the other participant either intentionally caused injury or engaged in conduct so reckless as to be totally outside the range of ordinary activity involved in the sport.[6] The plaintiff's assumption of risk is primary in nature inasmuch as it flows from the legal relationship of the parties, is evaluated according to an objective standard rather than a subjective standard, and acts to bar recovery. Thus, it is a question of law for the determination of the court, whether the injury-causing event was an inherent or reasonably foreseeable part of the game, such that the plaintiff is considered to have assumed the risk. If the court determines that the plaintiff did assume the risk, then the plaintiff's cause fails. If, on the other hand, the court determines that plaintiff did not assume the risk, then the cause proceeds to a jury to determine, as a question of fact, whether the co-participant intentionally or recklessly caused the injury.

■■■ In addition, because we recognize that rule infractions, deliberate or otherwise, are an inevitable part of many sports, a co-participant's violation of the rules of the game may be evidence of liability, but shall not *per se* establish reckless or intentional conduct. We share the Supreme Court of Connecticut's recognition that:

> In athletic competitions, the object obviously is to win. In games, particularly those ... involving some degree of physical contact, it is reasonable to assume that the competitive spirit of the participants will result in some rules violations and injures. That is why there are penalty boxes, foul shots, free kicks, and yellow cards.

*Jaworski*, 696 A.2d at 337. Thus, while some injuries may result from rules violations, we believe such violations are nonetheless an accepted part of any competition and among the anticipated risks of participation in the game.

**5.** Moreover, to the extent *Duke's GMC* is inconsistent with this opinion it is disapproved.

**6.** This author has advanced the position before, in his concurring opinion in *Lincke v. Long Beach Country Club*, 702 N.E.2d 738, 741 (Ind.Ct.App.1998), that co-participants in sporting activities should be considered to have assumed the inherent and foreseeable dangers of the activity as a matter of law. Specifically, this author stated that: "Any golfer in the rough of a hole which runs parallel to another should, as a matter of law, know the dangers of approaching golfers. To be surprised that approaching drivers hook or slice is akin to being surprised that not everyone shoots par. We have said often that 'there comes a point where this Court should not be ignorant as judges of what we know as men [or women].' This is a shining example of the application of that maxim." *Id.* (quoting *Willner v. State*, 602 N.E.2d 507, 509 (Ind.1992)).

We are affording enhanced protection against liability to co-participants in sports events, in part, because we recognize that they are not in a position, practically speaking, to protect themselves from claims. Event organizers, sponsors, and the like, are able to safeguard themselves from liability by securing waivers. They usually accomplish this by requiring each participant to sign a waiver and assumption-of-risk form as a condition of competing in the event.[7] However, in most instances, it is simply infeasible for participants to protect themselves by similar means. Indeed, at large sporting events, participants would have to exchange many releases in order to avoid liability.[8] Under the common law system of contributory fault, application of the doctrine of incurred risk would have allowed the judiciary to protect parties who, as here, cannot take steps to legally protect themselves from liability. However, when our legislature abandoned contributory negligence as a total bar to recovery and established a comparative negligence regime, it did not account for situations where parties are unable to protect themselves from liability. Thus, there is a void in the law. We recognize that one of the responsibilities of the judiciary is to fill such voids. Accordingly, we determine that, as a matter of law, participants in sporting events will not be permitted to recover against their co-participants for injuries sustained as the result of the inherent or foreseeable dangers of the sport.

7. Indeed, in the case at bar Rebecca was required to sign an "Acknowledgment, Waiver and Release From Liability" form in order to participate in the Triathlon. R. at 71. The release provided, in part:

> (c) I WAIVE, RELEASE, AND DISCHARGE from any and all claims, losses, or liabilities for death, personal injury, partial or permanent disability, property damage, medical or hospital bills, theft or damage of any kind, including economic losses which may in the future arise out of or relate to my participation in or my traveling to a USAT sanctioned event, THE FOLLOWING PERSONS OR ENTITIES: USAT, EVENT SPONSORS, RACE DIRECTORS, EVENT PRODUCERS, VOLUNTEERS, ALL STATES, CITIES, COUNTIES, OR LOCALITIES IN WHICH EVENTS OR SEGMENTS OF EVENTS ARE HELD, AND THE OFFICERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES AND AGENTS OF ANY OF THE ABOVE EVEN IF SUCH CLAIMS, LOSSES, OR LIABILITIES ARE CAUSED BY NEGLIGENT ACTS OR OMISSIONS OF THE PERSONS I AM HEREBY RELEASING OR ARE CAUSED BY THE NEGLIGENT ACTS OR OMISSIONS OF ANY OTHER PERSON OR ENTITY. (d) ... I also ASSUME ANY AND ALL OTHER RISKS associated with participating in USAT sanctioned events including but not limited to falls, contacts and/or effects with other participants ... and I further acknowledge that these risks include risks that may be the result of the negligence of the persons or entities mentioned above in paragraph (c) or of other persons or entities.

> R. at 71.

> As is generally the case, the release form that Rebecca signed does not relieve Kyle from liability as co-participants are not listed among the specific entities or individuals released from liability according to the plain language of the document. *See OEC–Diasonics, Inc. v. Major,* 674 N.E.2d 1312, 1314 (Ind.1996) (stating that a "release document[ ] shall be interpreted in the same manner as any other contract document." Thus, where the language is unambiguous, it should be interpreted as to its clear terms.).

8. For example, there were "more than 23,000" participants in the 2000 Mini Marathon in Indianapolis. Indianapolis Life 500 Festival Mini Marathon and 500 Festival 5K, *at* http://www.500festival.com. (last visited Mar. 7, 2001). Had each of the 23,000 participants attempted to obtain a release from the other 22,999 participants, this would have required the execution and exchange of 52,897,700 release forms. This endeavor would have taken even longer than it would take for this author to complete the requisite 13.1 miles of the mini marathon.

■■■ The foregoing standard means, in essence, that an action will lie in tort between co-participants in sports events "when players step outside of their roles as fellow competitors" and recklessly or intentionally inflict harm on another. Doerhoff, *supra*, at 744. A player will be considered to have acted in reckless disregard of the safety of another player if "he does an act, or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable person to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." *Restatement (Second) of Torts* § 500 (1965). A player acts intentionally when he desires to cause the consequences of his act, or when he believes that the consequences are substantially certain to result from it. *Id.* § 8a. Thus, recklessness differs from intentional wrongdoing in that while the act must be intended by the actor in order to be considered reckless, the actor does not intend the harm that results from the act.

■■■ Applying the foregoing standard, liability will not lie where the injury causing action amounts to a tactical move that is an inherent or reasonably foreseeable part of the game and is undertaken to secure a competitive edge. Thus, where a baseball pitcher throws the ball near the batter to prevent him from crowding the home plate, and the ball ends up striking the batter and causing injury, the pitcher's conduct would not be actionable. Similarly, there would be no tort liability where the defense in a football game strategically "blitzes" the opposing team's quarterback resulting in injury, or where one basketball team is leading by a point and, seconds from the end of the game, a member of that team chooses to foul the opponent when he drives the lane for a "slam dunk," thereby forcing him to try to win the game at the free throw line.

In contrast, if a co-participant vents his anger at another player by means of a physical attack, such conduct would be actionable. Instances of such tortious conduct would be where one boxer bites his opponent's ear during a boxing match,[9] or where a soccer or football player punches another player after a tackle. Similarly, if a baseball batter in a fit of anger intentionally flips his bat towards the opposing team's dugout and injures one of the players, liability might attach for such recklessness.

In light of these examples, it is our view that adoption of the recklessness or intentional conduct standard preserves the fundamental nature of sports by encouraging, rather than inhibiting, competitive spirit, drive, and strategy. Moreover, this standard will avoid judicial review of the kind of risk-laden conduct that is inherent in sports and generally considered to be part of the game, while at the same time imposing liability for acts that are clearly unreasonable and beyond the realm of fair play. Further, we believe that adoption of this standard will not compromise Indiana's status as the "Amateur Sports Capital of the World." Tammy Lieber, *20 Years of*

---

9. As one commentator has noted, "it is inconceivable that professional boxing or full contact karate matches could be conducted without some injury to one or both participants [as] [c]ausing bodily harm is the very essence of the match." Daniel Lazaroff, *Torts & Sports: Participant Liability to Co-participants for Injuries Sustained During Competition*, 7 U. Miami Ent. & Sports L.Rev. 191, 194 (1990). However, while injury as the result of a "left hook" or "jab" is considered an inherent or reasonably foreseeable part of professional boxing, injury as the result of a bite is not.

*Amateur Sports,* Indianapolis Bus. J., Apr. 12, 1999, at 3A.[10]

### D. Rebecca's Claim

▇ We now return to Rebecca's contention that the trial court erred in granting summary judgment in favor of Kyle on Count I of her complaint, in which Rebecca alleged that Kyle acted negligently in causing her injuries. In light of our holding regarding the appropriate standard of care between co-participants in a sporting event, allegation or proof of negligent conduct is insufficient to create liability. Thus, Count I of Rebecca's complaint must fail.

With regard to Count II, alleging that Kyle acted intentionally, recklessly and willfully in causing her injuries, the trial court must determine whether Kyle's action was an inherent or reasonably foreseeable part of the sport, such that Rebecca assumed the risk of injury as a matter of law. In our view, it is reasonably foreseeable that a competitor in a cycling race may attempt to cut in front of co-participants in an effort to advance position. Thus, if Rebecca is unable to develop the facts beyond those presented at this juncture, we would conclude that Kyle's action was an inherent risk in the event that Rebecca assumed as a matter of law, thereby precluding recovery.

### CONCLUSION

We thus conclude that the trial court properly granted summary judgment in favor of Kyle as to Count I of Rebecca's complaint. Accordingly, we affirm the trial court's decision with respect to Count I. We also remand to the trial court for further proceedings on Count II consistent with this opinion, to determine whether, under the facts of this case as they develop, Rebecca assumed the risk of injury as a matter of law.

BROOK, J., and BARNES, J., concur.

10. As a result of the Indiana Sports Corporation's initiative to turn Indianapolis into the "Amateur Sports Capital of the World," Indiana has hosted several major sporting events and enjoyed the attendant economic, cultural, and recreational benefits. Lieber, *supra,* at 41A. Some of the major sporting events that Indiana has hosted include the: Pan American Games; Indianapolis 500 Mile Race; Brickyard 400—NASCAR Winston Cup Series; World Championships in gymnastics, rowing, and track and field; Olympic trials for canoe/kayak, diving, rowing, swimming, track and field and wrestling; U.S. National Championships in diving, figure skating, gymnastics, rowing, and swimming; Hoosier Basketball Classic; Big Ten Men's and Women's Swimming and Diving Championships and Outdoor Track and Field Championships; and the International Race of Champions (IROC). In 2001 Indiana will host, among other events, the World Police and Fire Games, Hoosier State Games, Coca Cola Circle City Classic, Youthlinks Indiana Charity Golf Tournament, RCA Tennis Championships, Corporate Challenge, PeyBack Classic II, and the USA Judo National High School and Collegiate Championships. Other sporting events scheduled to take place in Indiana during the next few years include the 14th World Basketball Championship for Men in 2002, the 2003 World Gymnastics Championships, the 2004 World Swimming Championships, and the 2006 NCAA Men's Final Four. Correspondence from the Indiana Sports Corporation (March 7, 2001) (on file with author).