Douglas DAVIS, Robert E. Stone
and D.L. Stone, Appellants–
Defendants,

v.

Michael LeCUYER and Linda LeCuyer,
Individually and as parents and natu-
ral guardians of Benton LeCuyer, a
minor, Appellees–Plaintiffs.

No. 49A02–0501–CV–33.[1]

Court of Appeals of Indiana.

June 26, 2006.

1. We heard oral argument on April 11, 2006 at Hamilton Southeastern High School in Fishers, Indiana. We thank the school's ad-ministration, faculty, and students for their hospitality, and counsel for their presenta-tions.

Steve Groth, Bryan H. Babb, Marisol Sanchez, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellants.

D. Bruce Kehoe, Christopher G. Stevenson, Wilson Kehoe & Winingham, Indianapolis, IN, Attorneys for Appellees.

## OPINION

MATHIAS, Judge.

Douglas Davis, Robert E. Stone, and D.L. Stone bring this interlocutory appeal from the Marion Circuit Court's denial of summary judgment on Michael LeCuyer, Linda LeCuyer, and Benton LeCuyer's complaint alleging negligence, negligent entrustment, and negligent supervision. Concluding that the trial court properly denied summary judgment, we affirm.

### Facts and Procedural History

On the night of July 3, 2001, sixteen-year-old Benton LeCuyer ("Benton") spent the night with his friend Douglas Davis ("Doug") at the home of Doug's mother and stepfather, D.L. and Robert Stone (the "Stones"). At about noon on July 4th, Benton drove home, showered, and changed. He then asked his parents if he could join Doug and the Stones on their boat to watch fireworks that evening. Benton's parents gave their permission, and his father drove him back to the Stones' house. Once there, Doug suggested that he and Benton ride two jet skis owned by the Stones. Doug asked his mother's permission to take the jet skis out on Geist Reservoir and she agreed that the boys could go. Meanwhile, Doug's stepfather was busy working in the yard and did not participate in the decision to allow the boys to take out the jet skis, but he did notice the boys putting the jet skis in the water.

According to Benton, neither Doug nor the Stones gave him any instruction on how to operate a jet ski, but he did not consider such instruction necessary. Benton had operated other jet skis in the past. In addition, Benton had a driver's license, and both Doug and Benton had boater safety cards they received after completing a DNR-sponsored boating safety course in school.

After taking the jet skis out of the no wake zone, Benton showed Doug how to do a "power turn," which is "where you hold the throttle down and turn real sharply, kind of do a 180–degree or 360–degree turn." Appellant's App. p. 62. The two "took turns doing power turns to see who could do a power turn the best and spray each other with water." Id. They then "headed south on Geist Reservoir toward the dam area." Appellant's App. p. 71. At first they traveled side by side, but at some point Benton accelerated ahead. He then made a sharp left turn directly in Doug's path, and Doug's jet ski collided with Benton's. Benton suffered a serious leg injury and was taken to the hospital.

On March 27, 2003, the LeCuyers filed a complaint for damages in Marion Circuit Court. Count I of the complaint alleged that Doug operated a jet ski "negligently, carelessly, and recklessly" causing the accident and injury to Benton. In Count II, the LeCuyers alleged that the Stones negligently instructed and supervised both Doug and Benton on the use and operation of the jet skis on July 4, 2001.

The Stones filed a motion for summary judgment on April 23, 2004. The trial court conducted a hearing on July 13, 2004, and later denied the motion. The Stones then filed a "Motion to Reconsider, or in the Alternative, to Certify for Interlocutory Appeal [ ]." On December 16, 2004, the trial court denied the motion to reconsider, but certified the following questions for interlocutory appeal:

I. What standard of care controls the recreational operation of personal watercraft; and,

II. Is negligent supervision a separate tort in the State of Indiana as to which a person may be liable to a minor in his care?

We accepted jurisdiction pursuant to Indiana Appellate Rule 14(B).

## Standard of Review

When reviewing a grant or denial of summary judgment our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party.

*Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 973 (Ind.2005) (internal citations omitted). In determining whether the trial court erred in denying summary judgment, we give careful scrutiny to the pleadings and designated materials, construing them in a light most favorable to the non-movant, while also clothing the trial court's decision with a presumption of validity. *Diversified Fin. Sys., Inc. v. Miner*, 713 N.E.2d 293, 297 (Ind.Ct.App. 1999).

## I. Standard of Care for Recreational Operation of Personal Watercraft

Citing three recent cases from this court, the Stones argue that the standard of care that applies "between voluntary co-participants in recreational and sporting activities" is recklessness, rather than negligence. They then argue that they are entitled to summary judgment on the LeCuyers' claims, as no evidence was presented to the trial court that Doug acted intentionally or recklessly while operating the jet ski.

In *Mark v. Moser*, 746 N.E.2d 410 (Ind. Ct.App.2001), this court addressed the standard of care to be applied between co-participants in a "sports activity." There, a participant in an organized triathlon competition claimed that a fellow triathlete acted negligently and recklessly by cutting in front of her during the bicycling portion of the event, causing a collision and seriously injuring her. The trial court entered summary judgment in favor of the defendant on the issue of negligence. We affirmed, holding that "voluntary participants in sports activities assume the inherent and foreseeable dangers of the activity and cannot recover for injury unless it can be established that the other participant either intentionally caused injury or engaged in conduct so reckless as to be totally outside the range of ordinary activity involved in the sport." *Mark*, 746 N.E.2d at 420.

In departing from the ordinary standard of care for co-participants in an organized sports activity, *Mark* relied upon authority from other jurisdictions, as well as the recognized public policy justifications for applying a recklessness standard. "The rationale behind a [recklessness] standard of care is the fear of a flood of litigation, the desire to encourage vigorous athletic competition and participation in sporting events, and the perception that risk of injury is a common and inherent aspect of sports and recreational activity." *Id.* at 421. *Mark* then noted that the adoption of a recklessness or intentional conduct standard "preserves the fundamental nature of sports by encouraging, rather than inhibiting, competitive spirit, drive, and strategy." *Id.* at 422.

■ Later, in *Gyuriak v. Millice*, 775 N.E.2d 391 (Ind.Ct.App.2002), *trans. denied*, a golfer who was struck in the head and injured by another player's errant tee shot during a charity golf outing claimed the other player's negligence and recklessness caused his injury. The trial court granted summary judgment for the other player. We affirmed, holding that the golfer assumed the risk of being struck by another golfer's ball, and therefore the other player did not owe a duty of care with regard to his tee shot. "This is because the primary assumption of risk occurs when an individual, by voluntarily engaging in an activity, consents to those risks that are inherent in and arise by virtue of the nature of the activity itself. In such cases, the participant is owed no duty with regard to such inherent and ordinary risks." *Gyuriak*, 775 N.E.2d at 394 (citations omitted). When a participant in a sporting activity sustains an injury as a result of risks "inherent" in the activity, comparative fault principles do not apply because there has been no breach of any duty of care. *Id.* at 394–95.

■ Finally, in *Geiersbach v. Frieje*, 807 N.E.2d 114 (Ind.Ct.App.2004), *trans. denied*, we applied the rationale of *Mark* and *Gyuriak* and affirmed the denial of summary judgment to a collegiate baseball player seeking damages for injuries he sustained during an infield practice drill. *Geiersbach* applied recklessness as the proper standard of care for organized sporting events and practices, and noted that the "reasonable care standard was developed to guide people in their day to day lives.... Athletes, on the other hand, choose to participate in sports [which] by their nature involve a certain amount of inherent danger." 807 N.E.2d at 118. *Geiersbach* then clarified that the "incurred risk" and "assumption of risk" language employed in *Mark* and *Gyuriak* was better understood as a determination of whether such risks were inherent in the sport at issue. *Id.* at 119. Thus, when a participant in an organized sporting activity sustains an injury as a result of risks

inherent in the activity, incurred risk factors into the factual inquiry regarding the proper apportionment of fault under Indiana's Comparative Fault scheme. *Id.; see also Gyuriak,* 775 N.E.2d at 394–95.

The Stones argue that these cases establish recklessness as the standard of care applicable to co-participants in *any* sporting or recreational activity, whether organized or casual. The LeCuyers, in turn, argue that expanding the rationale of *Mark, Gyuriak,* and *Geiersbach* to include all sporting or recreational activities would create unnecessary ambiguity about what activities should be subject to the lower, recklessness standard. In addition, they argue that the policy reasons supporting the application of the recklessness standard of care to organized sporting or recreational activities do not support extending that standard to casual use of a jet ski. We agree with the LeCuyers.

Applying a recklessness standard to any use of a jet ski in order to encourage vigorous participation is neither a legitimate nor necessary policy goal. Moreover, the nature of jet skiing does not present the same potential for a flood of litigation as do certain contact sports. Jet skiing simply does not raise the concern expressed in *Mark* that if "simple negligence were to be adopted as the standard of care, every punter with whom contact is made, every midfielder high sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player tripped would have the ingredients for a lawsuit if injury resulted." 746 N.E.2d at 417 (quoting *Jaworski v. Kiernan,* 241 Conn. 399, 696 A.2d 332, 338 (1997)).

Moreover, Indiana Code section 14–15–12–10 indicates that an ordinary negligence standard of care applies to casual jet skiers. In particular, that statute provides that "[a] personal watercraft operated on public waters must at all times be operated in a reasonable and prudent manner," and that "[a] person shall not . . . [s]teer a personal watercraft toward an object or individual in the water and turn sharply at close range in a way that endangers human life, human physical safety, or property." Ind.Code § 14–15–12–10(a), (c)(6) (1995). Notably, Indiana Code section 14–15–12–12 exempts both performers in professional exhibitions and participants in regattas, races, marine parades, tournaments, or exhibits held in compliance with certain rules from the requirements of "reasonable and prudent" operation of personal watercraft. Ind.Code § 14–15–12–12 (1995).

Despite this statutory language, the Stones contend that the relationship between Doug and Benton as co-participants in the "sport" of jet skiing supports the application of a recklessness standard of care. They assert that the "obvious purpose" of Indiana Code section 14–15–12–10 is to "describe the standard of care that operators owe to members of the general public" and to "protect the general public from injury by jet ski operators who are strangers and with whom no qualifying relationship exists." Br. of Appellant at 20. They argue that "Benton's actions [of doing 'power turns' at close range] take his relationship with Doug outside of the statute's general 'reasonable and prudent' purview, which is aimed at strangers[.]" Br. of Appellant at 22. They even go so far to acknowledge that the "statutory negligence argument would be well-suited if this appeal concerned what standard of care Benton and Doug owed other members of the general boating public. If it did, the Stones would concede that a simple negligence standard would—and should—apply" based on the relationship of jet skiers to the general public and Indiana Code section 14–15–12–10. Reply Br. at 15

However, we cannot conclude that Doug and Benton's relationship as co-participants in casual jet skiing removes them from the purview of the personal watercraft statute. In *Clipp v. Weaver*, 451 N.E.2d 1092 (Ind.1983), our supreme court held that a boat operator owes a duty of reasonable care to all persons, including passengers on his or her boat. In doing so, the *Clipp* court not only considered the relationship of a boat operator to his or her guests, but also looked to the watercraft statute in effect at the time, which provided that a person operating any boat shall operate the boat "in a careful and prudent manner." [2] *Id.* at 1094 (quoting Ind.Code § 14–1–1–16).[3]

Finally, in support of their argument that Doug and Benton's relationship should be the determinative factor in deciding which standard of care to apply, the Stones also direct our attention to *Peart v. Ferro*, 119 Cal.App.4th 60, 13 Cal.Rptr.3d 885 (2004). In that case, a California appellate court looked to both the inherent nature of jet skiing and the relationship of the parties in determining that a lower, recklessness standard should apply to casual users of jet skis, despite statutory language requiring that personal watercraft be operated "in a reasonable and prudent manner." 13 Cal.Rptr.3d at 900.

We are not persuaded by the reasoning of our California colleagues. In fact, we believe that the *Peart* rationale and the application of that rationale on a case-by-case basis are precisely what Indiana courts can, and need to, avoid. In *Peart*, the California Court of Appeal, in a 3–2 decision, chose to resolve a jet ski accident by defining any use of a jet ski as a "sport," thereby consigning all jet ski use to a lower, recklessness standard of care, subject to the application of the doctrine of primary assumption of risk. Upon application of the doctrine of primary assumption of risk to Peart's claim, both the trial court and the Court of Appeal determined that Peart's claim was barred. The *Peart* court did this against the background of California's pure comparative fault system where nothing less than 100 percent negligence bars recovery and with reference to prior opinions of the California courts which held water-skiing and "tubing" to be sports, and therefore also subject to the doctrine of primary assumption of risk.[4]

■ We believe Indiana should take a different path, for several reasons. First, Indiana's General Assembly long ago made the public policy decision to establish Indiana as a modified, comparative fault state. In Indiana, if one's own negligence in the proximate causation of one's injuries or damages is greater than 50 percent, (s)he may not recover. This modification to the pure comparative fault system in place in California serves as an important safeguard against what most Hoosiers would consider "frivolous" claims, by parties whose own conduct was the predominant, proximate cause of an accident and

---

**2.** The *Clipp* court also rejected the argument that Indiana's common law on host-licensee liability for property owners should extend to boat operators, and noted that Indiana common law has long distinguished premises from conveyances. *Id.* at 1093.

**3.** *See now* Ind.Code § 14–15–3–3 (1998).

**4.** *See Ford v. Gouin*, 3 Cal.4th 339, 11 Cal. Rptr.2d 30, 834 P.2d 724 (1992) (holding recreational water skiing to be a sport); *Knight v. Jewett*, 3 Cal.4th 296, 11 Cal.Rptr.2d 2, 834 P.2d 696 (1992) (addressing of primary assumption of risk); *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975) (adopting a pure comparative fault scheme); *Bjork v. Mason*, 77 Cal.App.4th 544, 92 Cal.Rptr.2d 49 (2000) (holding inner tubing to be a sport); *Record v. Reason*, 73 Cal. App.4th 472, 86 Cal.Rptr.2d 547 (1999) (holding inner tubing to be a sport).

resulting injuries to themselves and others.[5]

Second, if the casual use of jet skis on our waterways becomes the first activity reduced to a "recklessness" standard of care via the common law, what would be next? The casual use of motocross motorcycles on private property? The casual use of a sailboat on a windy day? The casual use of tractors and other farm machinery on private property or on public highways? The casual use of road-legal motorcycles on our public highways? These possibilities and others, and the case-by-case consideration of them by the courts are truly troubling prospects and contrary to the unique Hoosier lifestyle. They are also public policy decisions that our General Assembly should make and, to a great extent, has already made by codifying modified, comparative fault.

For these reasons and more, we believe that the facts before us fit quite comfortably into Indiana's modified, comparative fault system, as that system has been further refined by the *Mark*, *Gyuriak* and *Geiersbach* cases. Those cases stand for the broad and workable proposition that only *organized* sporting and recreational activities might *potentially* be subject to a lower, recklessness standard of care. Moreover, in light of our supreme court's reliance on Indiana Code section 14–1–1–16 (now section 14–15–3–3) in *Clipp*, we conclude that the "regulation of personal watercraft" in Indiana Code section 14–15–12–10(a) establishes that a negligence standard should apply to casual jet skiing.

As such, issues of material fact remain as to the apportionment of fault between Doug and Benton, and the trial court properly denied summary judgment on this issue to the Stones.

## II. Negligent Supervision as a Separate Tort Action

■ Next, the Stones argue that the trial court improperly denied their motion for summary judgment on Count II of the LeCuyers' complaint, which alleged that the Stones negligently instructed and supervised both Doug and Benton on the use and operation of the jet skis on July 4, 2001.

First, the Stones contend that they were entitled to summary judgment on the claims of negligence regarding their son Doug because the LeCuyers did not specifically respond to their designated evidence and arguments regarding their supervision of Doug. However, "[s]ummary judgment shall not be granted as of course because the opposing party fails to offer opposing affidavits or evidence, but the court shall make its determination from the evidentiary matter designated to the court." Ind. Trial Rule 56(C) (2006); *Vetor by Weesner v. Vetor*, 634 N.E.2d 513, 515 (Ind.Ct.App. 1994). After receiving designated evidence from both parties, the trial court denied the Stones summary judgment on all the LeCuyers' claims, and certified the question at issue as to Count II as whether negligent supervision is "a separate tort in the State of Indiana as to which a person may be liable to a minor in his care." Appellant's App. p. 314. Thus the trial court properly denied summary judgment on the claim of negligent supervision of the Stones' son Doug.

---

**5.** As noted above, under Indiana's modified comparative fault system, a claimant found to be more than fifty percent at fault is barred from recovery. See Indiana Code § 34–51–2–6 (1999). This system serves as a better filter to needless litigation than California's pure comparative fault scheme, under which a primary tortfeasor can file a claim and obtain substantial recovery against lesser, and even marginally, at-fault, associated tortfeasors. For example, a California tortfeasor found to be 90 percent at fault for her own injuries could still file a claim and recover damages from a party found to be 10 percent at fault.

Initially, we observe that there is a well-recognized duty in tort law that persons entrusted with children have a duty to supervise their charges. *Wells v. Hickman,* 657 N.E.2d 172, 179 (Ind.Ct. App.1995) (citing *Vetor,* 634 N.E.2d at 515; *Johnson v. Pettigrew,* 595 N.E.2d 747, 753 (Ind.Ct.App.1992), *trans. denied).* The duty is to exercise ordinary care on behalf of the child in custody. *Wells,* 657 N.E.2d at 179 (citing *Johnson,* 595 N.E.2d at 753). The duty exists whether or not the supervising party has agreed to watch over the child for some form of compensation. *Id.* However, the caretaker is not an insurer of the safety of the child and has no duty to foresee and guard against every possible hazard. *Johnson,* 595 N.E.2d at 753.

In *Johnson,* the parents of a thirteen-year-old boy injured while burning trash and playing with gasoline with a friend at the friend's house brought an action against the friend's parents. While this court held that the parents could not be held liable as landowners on a theory of premises liability, we also held that the Johnsons' complaint stated a separate and viable cause of action for failure to supervise. 595 N.E.2d at 753. *See also Illinois Farmers Ins. Co. v. Wiegand,* 808 N.E.2d 180 (Ind.Ct.App.2004), *trans. denied* (holding that parents' homeowners policy did not cover a claim for negligent supervision of an child guest). The LeCuyers contend that Indiana therefore recognizes a separate tort for negligent supervision and that questions of fact remain with regard to whether the Stones breached their duty to supervise Benton. We agree.

Attempting to avoid the clear import of *Johnson,* the Stones frame the issue on appeal as whether they had an *"in loco parentis* duty to instruct, supervise, or warn [ ] Benton." Br. of Appellant at 31. They then argue that "to impose the duty element of the tort of negligent parental supervision, 'the parent must know or should have known that the child had a habit of engaging in the particular act or course of conduct which led to the plaintiff's injury.'" Br. of Appellant at 32 (quoting *Shepard by Shepard v. Porter,* 679 N.E.2d 1383, 1389 (Ind.Ct.App.1997)). The Stones contend that because Benton had earned a boater safety certification, and because no evidence was presented to establish that Benton had a history of reckless behavior on jet skis, they had no duty to instruct, supervise, or warn him. However, *Shepard,* as well as the other cases cited by the Stones, discuss only the duty of supervision a parent owes with regard to the conduct of his or her own child. They do not address the duty owed by an adult entrusted with the care of another's child, as *Johnson* clearly does. Hence, we find the Stones' *in loco parentis* argument unpersuasive.

In light of our court's previous holdings in *Johnson* and *Illinois Farmers,* we believe Indiana law recognizes negligent supervision of a minor in one's care as a separate tort. Issues of material fact remain regarding the Stones' supervision of Benton, and the trial court properly denied summary judgment to the Stones.

### Conclusion

The trial court properly denied summary judgment.

Affirmed.

KIRSCH, C.J., and FRIEDLANDER, J., concur.