Cassie E. PFENNING, Appellant–Plaintiff,

v.

Joseph E. LINEMAN, Whitey's 31 Club, Inc., Marion Elks Country Club Lodge # 195, and the Estate of Jerry A. Jones, Appellees–Defendants.

No. 27A02–0905–CV–444.

Court of Appeals of Indiana.

Feb. 12, 2010.

Christine M. Marcuccilli, Rothberg Logan & Warsco, LLP, Fort Wayne, IN, Attorney for Appellant.

Marie Anne Hendrie, The Law Offices of Hanover Ins. Group, Inc., South Bend, IN, Attorney for Appellee Joseph E. Lineman.

James J. Shea, Sr., Linda A. Polley, Fort Wayne, IN, Attorneys for Appellee Whitey's 31 Club, Inc.

Ryan L. Leitch, Laura S. Reed, James O. Griffin, Riley Bennett & Egloff, LLP, Indianapolis, IN, Attorneys for Appellee Marion Elks Country Club Lodge # 195.

Kyle C. Persinger, Spitzer Herriman Stephenson Holderead Musser & Conner, LLP, Marion, IN, Attorney for Appellee The Estate of Jerry A. Jones.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Cassie E. Pfenning appeals the trial court's entries of summary judgment in favor of Joseph E. Lineman; Whitey's 31 Club, Inc. ("Whitey's"), an Indiana corporation; Marion Elks Country Club Lodge # 195 (the "Elks"), a fraternal organization; and the Estate of Jerry A. Jones (collectively, the "Defendants").[1]

We affirm.

---

1. Pfenning's mother, Jeri Greene, originally filed the complaint on behalf of Pfenning, as Pfenning's parent and natural guardian. The trial court subsequently granted the motion to substitute Pfenning as the plaintiff after she turned eighteen years old. Pfenning, by her mother, originally filed the complaint against Jerry Jones. Upon his death, the trial court substituted his Estate's personal representative as a defendant.

*ISSUE*

Whether the trial court erred in granting summary judgment to the Defendants.

*FACTS*

The facts most favorable to Pfenning as the non-moving party indicate that Whitey's, a bar, sponsored a golf scramble at the Elks' golf course in Marion on August 19, 2006. Whitey's enlisted golfers by posting sign-up sheets in the bar. It also provided sign-up sheets for volunteers to serve beverages from golf carts. The forty-five dollar entrance fee covered the costs of green fees, prizes, golf carts, and beverages. The Elks did not sponsor the event but merely supplied the golf carts and beverages, including beer, for the event. Jerry Jones, Pfenning's grandfather, signed up to drive a beverage cart.

The morning of the scramble, Jones invited the then-sixteen-year-old Pfenning to ride in a beverage cart with him during the tournament. With her mother's permission, Pfenning agreed to join Jones.

Upon arriving at the golf course, Jones retrieved a beverage cart for his and Pfenning's use and brought it to where Pfenning was waiting, in front of the clubhouse. The cart had a large cooler in the back for drinks but no roof or windshield. Pfenning received no instructions regarding how or where to operate the cart; she was unfamiliar with golf etiquette and had been to a golf course only once before in 1997. Pfenning initially did not assist in loading the cart's cooler with beverages and did not meet the other two beverage cart operators out on the course during the scramble.

Prior to the start of the scramble, Jones decided to join one of the teams playing in the scramble as it was short a player. He therefore left Pfenning with his sister, Lottie Kendall. Kendall and Pfenning drove the beverage cart together for a short period of time until Kendall also decided to play in a foursome. Christie Edwards, a Whitey's employee, therefore took Kendall's place in the beverage cart. Pfenning drove the cart, and Edwards dispensed the beverages to the scramble's participants.

Approximately three hours into the tournament, Lineman, a participant in the scramble, hit a drive from the 16th hole's tee. The ball traveled straight for approximately sixty to seventy yards before "turn[ing] directly left." (App. 69).[2] As Lineman followed the ball's trajectory, he observed the roof of a golf cart, belonging to another foursome, in the ball's path. Pfenning, who was driving the beverage cart on a cart path near the 18th hole, did not hear any warning regarding the ball's approach. After traveling more than two hundred feet, the ball struck Pfenning in the mouth, causing injuries to her mouth, jaw, and teeth.

On February 7, 2007, Pfenning filed a complaint against the Defendants. She alleged as follows:

22. The Defendants failed to exercise reasonable care for the safety of [Pfenning] by failing to provide her with a beverage cart that contained a canopy or a windshield to provide [her] with some measure of protection from the risks associated with being struck by a flying golf ball.

23. The Defendants failed to exercise reasonable care for the safety of [Pfenning] by failing to provide her with any warnings, any information or any safety instructions prior to sending her onto a

2. Unless otherwise specified, all citations to the Appendix refer to the appendix filed by Pfenning.

golf course that was full of golfers (most of which were drinking alcohol) to dispense beverages.

24. The Defendants negligently failed to exercise reasonable care for the safety of [Pfenning] while she was on the premises of the [Elks'] golf course.

25. As a direct and proximate result of the Defendants' negligent conduct, [Pfenning] suffered painful and permanent injuries and incurred significant medical and dental expenses. Several of [her] teeth were destroyed and her teeth remain missing and/or disfigured. [She] will incur significant dental expenses in the future.

26. As a direct and proximate result of the Defendants' negligent conduct, [Pfenning] suffered mental and emotional pain and anguish.

27. As a direct and proximate result of the Defendants' negligent conduct, [Pfenning]'s ability to function as a whole person has been impaired. The quality of [her] life has been significantly diminished as a result of the Defendants' negligent conduct.

(App. 54–55).

The Elks, Lineman, and Jones filed motions for summary judgment and memoranda in support thereof on February 4, 2009. Whitey's filed a motion for summary judgment on February 10, 2009.

Pfenning filed a memorandum in opposition to the Defendants' motions for summary judgment on March 4, 2009. The trial court held a hearing on the motions for summary judgment on March 12, 2009. During the hearing, Pfenning raised the issue of Jones' purported negligent supervision. On April 27, 2009, the trial court entered its orders, granting the Defendants' motions for summary judgment.

## DECISION

Pfenning asserts that the trial court erred in granting summary judgment to the Defendants. Specifically, she contends that 1) the Defendants owed her a duty; and there exists genuine issues of material fact regarding whether 2) Lineman's conduct was reckless; 3) Jones, Whitey's, and the Elks were negligent in their supervision of her; and 4) the Elks and Whitey's breached a duty of reasonable care owed to her under the theory of premises liability.

When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it was for the trial court: whether there is a genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. *Landmark Health Care Assocs., L.P. v. Bradbury,* 671 N.E.2d 113, 116 (Ind. 1996). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. Ind. T.R. 56(C); *Blake v. Calumet Const. Corp.,* 674 N.E.2d 167, 169 (Ind. 1996). "A genuine issue of material fact exists where facts concerning an issue which would dispose of the litigation are in dispute or where the undisputed facts are capable of supporting conflicting inferences on such an issue." *Scott v. Bodor, Inc.,* 571 N.E.2d 313, 318 (Ind.Ct.App. 1991).

All evidence must be construed in favor of the opposing party, and all doubts as to the existence of a material issue must be resolved against the moving party. *Tibbs v. Huber, Hunt & Nichols, Inc.,* 668 N.E.2d 248, 249 (Ind. 1996). However, once the movant has carried his initial burden of going forward under Trial Rule 56(C), the nonmovant must come forward with sufficient evidence demonstrating the

existence of genuine factual issues, which should be resolved at trial. *Otto v. Park Garden Assocs.*, 612 N.E.2d 135, 138 (Ind. Ct.App. 1993), *trans. denied*. If the non-movant fails to meet his burden, and the law is with the movant, summary judgment should be granted. *Id.*

"Additionally, when material facts are not in dispute, our review is limited to determining whether the trial court correctly applied the law to the undisputed facts." *Mills v. Berrios*, 851 N.E.2d 1066, 1069 (Ind.Ct.App. 2006) (quoting *Bennett v. CrownLife Ins. Co.*, 776 N.E.2d 1264, 1268 (Ind.Ct.App. 2002)). We review a question of law de novo. *Id.* "Finally, if the trial court's grant of summary judgment can be sustained on any theory or basis in the record, we will affirm." *Beck v. City of Evansville*, 842 N.E.2d 856, 860 (Ind.Ct.App. 2006), *trans. denied*.

### 1. *Duty*

■ Pfenning asserts that the trial court erred in granting summary judgment in favor of the Defendants. She argues that the Defendants owed her a duty to prevent her from being injured and were negligent in breaching that duty.

To recover on a theory of negligence, a plaintiff must establish three elements: (1) defendant's duty to conform his conduct to a standard of care arising from his relationship with the plaintiff, (2) a failure of the defendant to conform his conduct to that standard of care, and (3) an injury to the plaintiff proximately caused by the breach.

Whether the defendant must conform his conduct to a certain standard for the plaintiff's benefit is a question of law for the court to decide. Courts will generally find a duty where reasonable persons would recognize and agree that it exists. This analysis involves a balancing of three factors: (1) the relationship be-

tween the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. *Estate of Heck ex rel. Heck v. Stoffer*, 786 N.E.2d 265, 268 (Ind. 2003), *reh'g denied*. " 'Generally, whether a duty exists is a question of law for the court to decide, although sometimes the existence of a duty depends upon underlying facts that require resolution by a trier of fact.' " *Parsons v. Arrowhead Golf, Inc.*, 874 N.E.2d 993, 996 (Ind.Ct.App.2007) (quoting *Bowman ex rel. Bowman v. McNary*, 853 N.E.2d 984, 990 (Ind.Ct.App. 2006)).

This court had consistently held that "there is no duty from one participant in a sports activity to another to prevent injury resulting from an inherent risk of the sport." *Bowman*, 853 N.E.2d at 990; *see also Geiersbach v. Frieje*, 807 N.E.2d 114 (Ind.Ct.App. 2004), *trans. denied*; *Gyuriak v. Millice*, 775 N.E.2d 391 (Ind.Ct.App. 2002), *trans. denied*; *Mark v. Moser*, 746 N.E.2d 410 (Ind.Ct.App. 2001). In *Geiersbach*, a panel of this court extended "participant" to include "any person who is part of the sporting event or practice involved." 807 N.E.2d at 120. "By participant," the *Geiersbach*-court included "players, coaches, and players who are sitting on the bench during play." *Id.* Furthermore, in *Parsons*, we held that an owner of a golf course did not owe a duty to a golfer, where the golfer was "a voluntary participant in the sporting activity of golf," and the golfer's injury "was an inherent risk of the game of golf." 874 N.E.2d at 997.

#### a. *Participant*

■ Here, Pfenning maintains that she was not a participant in the golf scramble because "[s]he was not playing; she was not watching the event; she was not signed up on a team; nor was she doing anything related to the activity of golf."

Pfenning's Br. at 14. Thus, she argues that the Defendants owed her a duty to prevent her injury. We disagree.

Pfenning's presence on the golf course was due to the fact there was a golf scramble; she had agreed to function as a driver or rider in a beverage cart provided for the golf scramble; and she performed this function and assisted in providing beverages to players in the golf scramble. If not for the golf scramble, Pfenning would not have been on the golf course the day of the incident. Although not a player herself, she clearly was "part of the sporting event . . . involved," and we hereby expand the language in *Geiersbach* to include sporting event volunteers such as Pfenning. *Geiersbach*, 807 N.E.2d at 120. We therefore find that Pfenning was a participant in the golf scramble.

b. *Inherent risks*

■ Pfenning, however, also seems to argue that she could not have consented to the inherent risks of golf as "[s]he knew nothing about golf and could not appreciate any risk involved with being near a golf course." Pfenning's Br. at 14. We find this argument unavailing.

Those participating in the event or practice should be precluded from recovering for injuries received resulting from dangers or conduct inherent in the game unless they prove that the conduct was reckless or the injury intentional. . . . Such a danger is inherent in the game and the participant should not be able to recover from the player, team, or stadium without proving recklessness or that the injury was somehow intentional. *Geiersbach*, 807 N.E.2d at 120.

■ Even if we were to assume that Pfenning arrived at the golf course utterly ignorant of the game, the undisputed facts show that Pfenning had been participating in the golf scramble event for approximately three hours prior to being struck by the golf ball. Over this extended time period, she had been delivering beverages to foursomes during play. We find that this supports an inference that Pfenning was aware of the inherent risks of golf; namely, that it involves players hitting golf balls long distances and that some, if not many, of these balls invariably fail to land where intended.[3] *See, e.g., Beckett v. Clinton Prairie Sch. Corp.*, 504 N.E.2d 552, 555 (Ind.1987) (holding that while actual knowledge is a prerequisite element of incurred risk, the "plaintiff's actual knowledge may be proven by circumstantial evidence notwithstanding the absence of a plaintiff's admission of such knowledge").

Given Pfenning's status as a participant in the golf scramble, with its inherent risks, we find that the Defendants did not

---

**3.** Pfenning does not assert that being struck with a golf ball while driving a golf cart is not an inherent risk of golf. Nonetheless, we note that "[c]onsideration of whether the injury-causing event was an inherent or reasonably foreseeable part of the game is a correct evaluation, under an objective standard as a question of law for courts to decide." *Parsons*, 874 N.E.2d at 998. We believe that being struck by an errant golf ball while operating a golf cart on a golf course's cart path is an inherent risk of the game of golf.

We also note that Pfenning makes much ado regarding not receiving instructions on how or where to operate the beverage cart. We, however, question the import of this argument inasmuch it is undisputed that she was struck while operating the beverage cart on a cart path. As to not being told to drive "toward the golfers who are approaching a hole" and "the importance of keeping her eye on the group of golfers who were on the tee box hitting," the undisputed facts are that she was at the 18th hole when struck by a golf ball hit from the 16th hole. Pfenning's Reply Br. at 13. As to not being instructed "to duck or cover up if she saw or heard a golfer or group of golfers yell fore," we fail to see how this is relevant as Pfenning admits that she did not hear anyone yell, "fore." *Id.* at 14.

owe her a duty. Therefore, she is precluded from recovering from the Defendants without proving recklessness or that her injury was intentional.

## 2. *Recklessness*

 Pfenning asserts that the trial court erred in granting summary judgment in favor of Lineman. Specifically, she contends that there is a material issue of fact as to whether Lineman's conduct rose to the level of recklessness, given the conflicting testimony regarding whether he yelled, "fore" after hitting his ball from the 16th hole.[4]

> [P]recluding liability for negligent conduct but allowing recovery for reckless or more serious conduct in the context of sporting activities "will avoid judicial review of the kind of risk-laden conduct that is inherent in sports and generally considered to be part of the game, while at the same time imposing liability for acts that are clearly unreasonable and beyond the realm of fair play."

*Bowman*, 853 N.E.2d at 994 (quoting *Mark v. Moser*, 746 N.E.2d 410, 422 (Ind. Ct.App. 2001)). The conduct, however, "must be so reckless as to be totally outside the range of ordinary activity involved in the sport." *Id.*

 In the context of an event, such as a golf scramble or game,

> recklessness requires that a participant in a sporting activity be (1) conscious of his or her misconduct; (2) motivated by indifference for the safety of a co-participant or co-participants; and (3) know that his or her conduct subjects a co-participant or co-participants to a probability of injury. A mistake in judgment

is not sufficient to support a finding of recklessness. Rather, there must be a conscious indifference to the consequences of one's actions.

*Id.* at 995.

At the time of the incident, Pfenning was operating a cart on the cart path near the 18th hole. Lineman was at the 16th hole's tee box. He hit the ball, which initially traveled straight for approximately sixty to seventy yards. Apparently, Lineman hooked the ball, causing it to shift direction to the left. After traveling over 200 feet, the golf ball struck Pfenning. At no time did Lineman see Pfenning or her cart, and she was not in the line of play.

Given the definition of recklessness, even assuming that Lineman did not yell "fore" after hitting an errant golf ball, we cannot say that there are genuine issues of material fact, precluding summary judgment. There is no indication that Lineman acted with "conscious indifference to the consequences of [his] actions." *Id.* At most, Lineman's failure to audibly warn other participants potentially in the line of his errant ball is a mistake in judgment, which is insufficient to support a finding of recklessness. *See id.* at 996 n. 7 (finding that acting in violation of golf's standards of etiquette does not per se establish reckless or intentional conduct). This is particularly so given that Pfenning was not "within range in [Lineman]'s own fairway." *See Gyuriak*, 775 N.E.2d at 396 (finding no recklessness, where a golfer accidentally shanked his ball, causing it to strike another golfer, who was "not within the appropriate and anticipated range of the first player's ball"). Accordingly, we conclude

---

4. "If a player plays a ball in a direction where there is a danger of hitting someone, he should immediately shout a warning. The traditional word of warning in such a situation is 'fore.'" *http://www.usga.org/etiquette/tips/Golf–Etiquette–101/* (last visited Nov. 30, 2009).

that, as a matter of law, Lineman's conduct was not reckless; therefore, we find no error in granting summary judgment in his favor.[5]

### 3. *Negligent Supervision*

 Pfenning asserts that the trial court erred in granting summary judgment on the issue of negligent supervision. She argues that "Jones, Whitey's and [the] Elks all had a duty of reasonable care as to [her] because her care had been entrusted in them."[6] Pfenning's Br. at 9.

[T] here is a well-recognized duty in tort law that persons entrusted with children have a duty to supervise their charges. The duty is to exercise ordinary care on behalf of the child in custody. The duty exists whether or not the supervising party has agreed to watch over the child for some form of compensation. However, the caretaker is not an insurer of the safety of the child and has no duty to foresee and guard against every possible hazard.

*Davis v. LeCuyer*, 849 N.E.2d 750, 757 (Ind.Ct.App. 2006) (internal citations omitted), *trans. denied.* The duty to supervise children in one's charge exists because children's "characteristics make it likely that they may do somewhat unreasonable things[.]" *Johnson v. Pettigrew*, 595 N.E.2d 747, 752 (Ind.Ct.App. 1992), *trans. denied.*

Although the existence of duty is a matter of law for the courts to decide, a breach of duty is usually a matter left to the trier of fact. Only where the facts are undisputed and lead to but a single inference or conclusion may the court as a matter of law determine whether a breach of duty has occurred.

*King v. Northeast Security, Inc.,* 790 N.E.2d 474, 484 (Ind. 2003) (internal citations omitted), *reh'g denied.*

In *Johnson,* thirteen-year old Johnson went to the Pettigrew's farm to visit with their son, Joel. The Pettigrews asked Johnson, Joel, and Joel's cousin to burn some debris. At some point, the Pettigrews left the farm to run some errands, leaving Joel's eighteen-year-old brother, Jason, and their hired hand, Derrick, in charge of the younger boys.

At first, the younger boys continued to burn the debris as directed, but they soon tired of the routine and decided to "mess around" with the fire. The boys took a lighted shop rag on a stick and started another fire out of sight of the tool shed, fueling it with boxes, wood and other debris. Then, with Chuck acting as a lookout to ensure that Jason and Derrick would not see, they filled a plastic jug partially full of gasoline which they obtained from a tank used for farm purposes. The boys then laid the jug on its side near the fire and took turns stomping on it, propelling the gasoline into the fire and causing small explosions. When Jeff took his turn to stomp on the jug, gasoline splattered onto his leg and he caught fire. Though the boys were able to put the fire out, Jeff sustained second and third-degree burns to his legs.

595 N.E.2d at 749.

The Johnsons sued the Pettigrews, alleging negligence. The Johnson subse-

---

**5.** Pfenning does not assert that Jones, Whitey's, or the Elks were reckless or intentionally caused her injury.

**6.** Whitey's and Jones assert that Pfenning has waived this issue for failure to raise the claim in her memorandum in opposition to the Defendants' motions for summary judgment.

Generally, "matters not designated as genuine issues of material fact cannot be relied upon on appeal." *Poulard v. Lauth,* 793 N.E.2d 1120, 1123 (Ind.Ct.App. 2003). Any waiver notwithstanding, we choose to address this issue on the merits.

quently appealed from the trial court's granting of summary judgment in favor of the Pettigrews. This Court reversed, finding "genuine issues of fact remained as to whether the Pettigrews were negligent for their failure to properly supervise" Johnson, where the record revealed that "the Pettigrews, who *assumed the supervision* of Jeff Johnson, left the three boys in the custody of their employee and their son, who were instructed to change the tires on a truck in addition to watching over the boys as they burned debris." *Id.* at 753 (emphasis added).

In *Davis,* sixteen-year-old Benton went to the home of his friend, Doug, and Doug's mother and step-father, the Stones. Doug's mother gave the boys permission to take the Stones' jet skis out on Geist Reservoir. Doug's stepfather observed the boys putting the jet skis in the water. Neither adult instructed Benton on how to operate a jet ski, "but he did not consider such instruction necessary" as he had operated jet skis in the past; had a driver's license; and had completed a boating safety course. 849 N.E.2d at 751.

At some point, Doug and Benton started spraying each other with water by accelerating and sharply turning the jet skis. When Benton made a turn directly in Doug's path, Doug's jet ski collided with Benton's jet ski, causing a serious injury to Benton.

Benton's parents filed a complaint against the Stones, asserting that they negligently instructed and supervised both Doug and Benton on the use and operation of the jet skis. The trial court denied the Stones' motion for summary judgment. Finding the Stones' *"in loco parentis* argument unpersuasive," this Court held that issues of material fact remained regarding the Stones' supervision of Benton.

In both *Johnson* and *Davis,* the child's parent entrusted him to another's care and supervision; or, someone assumed the supervision of the child. Here, there is no evidence that Pfenning had been entrusted to the care, or was in the custody, of either Whitey's or the Elks. There is also no evidence that Whitey's or the Elks assumed the supervision of Pfenning; as a matter of fact, there is no evidence that the Elks even knew that Pfenning was on the golf course. Rather, Pfenning's mother left her in the care and supervision of Jones. Jones then left her in the care and custody of his sister.

There was no relationship between Pfenning and the Elks or Whitey's that would give rise to a duty under a negligent entrustment theory. Accordingly, we find no error in granting summary judgment to Whitey's and the Elks on Pfenning's claim of negligent entrustment.

As to Jones, the facts reveal that he left her in the care of his sister, an experienced golfer. Furthermore, at the time she was struck, Pfenning was operating the beverage cart on a designated cart path. Even if, as Pfenning suggests, Jones had "checked on" her "throughout the course of the day," there is no evidence that this would have prevented her injury. Pfenning's Reply Br at 4. There is also no evidence that adequate instructions would have prevented Pfenning's injuries given that, at the time of being struck, she was on a designated cart path and not in the line of play. To the contrary, according to the deposition of the Elks' golf professional, Pfenning was exactly where he, in his professional opinion, would have recommended her to be—namely, at the 18th hole—in order to best avoid being by struck by golf balls being hit from other holes. Pfenning has failed to designate any evidence to rebut his professional opinion.

Under these facts, we find, as a matter of law, that Jones did not breach his duty to exercise ordinary care on behalf of Pfenning, where neither she nor anyone on the golf course was engaged, or likely to engage, in "unreasonable" activities or conduct. *See Johnson,* 595 N.E.2d at 753. To hold otherwise would impose an unreasonable duty upon Jones to insure Pfenning's safety and "guard against every possible hazard." *Davis,* 849 N.E.2d at 757. Thus, we conclude that the trial court properly granted Jones summary judgment on Pfenning's claim of negligent entrustment.

### 4. *Premises Liability*

■ Pfenning also asserts that there is a genuine issue of material fact as to whether the Elks and Whitey's breached a duty of care owed to her under the theory of premises liability. Citing to *Hayden v. Univ. of Notre Dame,* 716 N.E.2d 603 (Ind.Ct.App. 1999), *trans. denied,* she contends that "the trial court should have looked to the totality of the circumstances and should have determined that questions exist for jury determination." Pfenning's Br. at 11.

In *Hayden,* William and Letitia Hayden were attending a football game on the Notre Dame campus. They sat in their assigned seats, which were located in one of the endzones, behind the goalpost. During the game, a football kicked toward the goal landed in the stands, near the Haydens' seats. Several people attempted to retrieve the football; one person struck Letitia, knocking her down. The Haydens brought suit against Notre Dame for failing to exercise care to protect Letitia. Notre Dame moved for summary judgment, arguing that it did not have a legal duty to protect Letitia from the intentional criminal acts of an unknown third person.

On appeal, this Court found the only element at issue to be whether Notre Dame owed Letitia a duty under the circumstances. It therefore applied the totality of the circumstances test, which " 'requires landowners to take reasonable precautions to prevent foreseeable criminal actions against invitees.' " 716 N.E.2d at 605 (quoting *Delta Tau Delta v. Johnson,* 712 N.E.2d 968, 973 (Ind. 1999)). Under this test, " 'a court considers all of the circumstances surrounding an event, including the nature, condition, and location of the land, as well as prior similar incidents, to determine whether a criminal act was foreseeable.' " 716 N.E.2d at 605–06 (quoting 712 N.E.2d at 972).

Applying the totality of the circumstances test, the *Hayden*-court found that the totality of the circumstances established that Notre Dame "should have foreseen that injury would likely result from the actions of a third party in lunging for the football after it landed in the seating area." 716 N.E.2d at 606. Specifically, "[t] here was evidence that there were many prior incidents of people being jostled or injured by efforts of fans to retrieve the ball." *Id.* Thus, Notre Dame owed Letitia a duty to protect her from such injury.

Here, Pfenning does not assert that a third party's criminal act caused her injury; that the act was foreseeable; or that there had been similar prior incidents. We therefore find no error in finding that the Elks and Whitey's did not have a duty to protect her from injury due to her being struck by an errant golf ball while she operated a beverage cart.

Finding no issues of material fact and that the Defendants are entitled to summary judgment as a matter of law, we conclude that the trial court properly

granted summary judgment in favor of the Defendants.

Affirmed.

MAY, J., concurs.

KIRSCH, J., concurs in part and dissents in part with separate opinion.

KIRSCH, Judge, concurring in part and dissenting in part.

Hmmm. After being abandoned by her grandfather and his sister, in whose care she had been entrusted, a sixteen-year-old girl, without training or experience in golf course safety or etiquette, is injured at a golf outing sponsored by a bar, while she is driving a beverage cart loaded with beer dispensed by one of the bar's employees. Surely, there is a duty here someplace.

Unlike my colleagues, I do not characterize the issues presented by this case to be ones of duty. Rather, I think the duty issues can be easily and quickly resolved, and that this case does not turn upon a determination of duty, but whether the defendants breached the duties that they clearly owed to the plaintiff and whether any such breach was the proximate cause of the plaintiff's injuries.

In *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991), our Supreme Court set out the decisional framework by which our courts determine the issue of duty in a negligence action and provided that courts shall look to the relationship between the parties, the foreseeability of the harm, and the public policy. Here is how I analyze the duty issues in the present case:

1. **The Elks Club.** The Elks Club was the owner of the premises upon which the golf outing was held and the owner of the beverage cart in which the plaintiff was injured. The Elks Club was in the business of making its golf course and golf carts available for outings such as the one sponsored by Whitey's Bar. It derived a financial return from doing so. Cassie Pfenning was upon the Elks Club property and in the beverage cart because of the golf outing from which the club was receiving a financial return. As such, the relationship between the club and Pfenning was that of business and business invitee and clearly weighs in favor of finding a duty of due care. Similarly, the club provided the golf and beverage carts as part of its business operation. Doing so also weighs in favor of finding a duty owed by the club. Secondly, it is clearly foreseeable that people upon a golf course may be injured from time to time by golf balls. Similarly, it is foreseeable that persons may be injured riding or driving golf carts if they fail to understand the risks of the game or the reasonable precautions to be taken when driving a golf cart. Finally, those in the business of operating golf courses for profit should take all reasonable steps to prevent an unreasonable risk of harm to those people who come upon the course. They are also in the best place to spread the risk of such injuries through liability insurance. Thus, public policy favors the imposition of such a duty.

2. **Whitey's Bar.** Whitey's organized and sponsored the golf tournament as a part of its business operations and derived a financial benefit from the outing. It provided the beer that was loaded into the beverage cart. It was also the employer of Christie Edwards, the person whom it put in charge of the beverage cart in which Pfenning was injured and in whose care Pfenning was entrusted by Kendall, who had assumed

such responsibility from Jones. Whitey's was the entity that allowed Pfenning to drive the cart without instruction. Pfenning acted as an unpaid agent of Whitey's, under the control and supervision of Edwards. Thus, the relationship weighs in favor of the imposition of a duty. The foreseeability and public policy considerations are the same as above and also weigh in favor of a duty.

3. **The Estate of Jerry Jones.** Jerry Jones was Pfenning's grandfather. He was the one to whom Pfenning's mother entrusted her care, the person whom Pfenning agreed to accompany, and the person who represented that he would be driving the beverage cart. Thus, the relationship factor weighs in favor of the imposition of a duty. The foreseeability issue is again the same as above. Regarding the public policy issue, I believe it strongly weighs in favor of finding a duty on the part of a grandparent to whom care of a minor is being entrusted in a setting in which alcoholic beverages are being served. Moreover, even in the absence of a legal duty, there is a question of material fact whether Jerry assumed such a duty of reasonable care for Pfenning's safety.

4. **Jerry Lineman.** Jerry Lineman was the participant in the golf outing who struck the errant shot that struck Pfenning. Lineman had no relationship with Pfenning and did not derive a financial benefit from either the outing or Pfenning's presence. Nothing in the designated materials discloses a special relationship between Lineman and Pfenning or shows that either foreseeability of the harm or public policy considerations are different *vis-à-vis* Pfenning than any golfer who was present on the course. Thus, I concur with my colleagues that summary judgment was properly entered for Lineman.

As I analyze this case, the Elks Club, Whitey's and Jones all owed a duty of reasonable care to Pfenning. The dispositive questions are not those of duty, but whether any such duty was breached and whether any such breach was a proximate cause of the plaintiff's injuries. Breach of duty and proximate cause are both issues of fact to be resolved by the trier of fact. Indeed, as we have often said, summary judgment is rarely appropriate in a negligence action and is not appropriate here. It may well be determined that the Elks Club, Whitey's Bar, and Jerry Jones did not breach any duty or that such breach was not a proximate cause of Pfenning's injuries. That is not for us to determine.

In addition to analyzing the duty issues differently than my colleagues, I reach a very different result on the question of whether Pfenning was a participant in the golf scramble. I do so along the following line of reasoning: Pfenning was a minor under her mother's care and control. Her mother agreed only that her daughter could attend the golf outing with her grandfather in whose care she was entrusted. Had Pfenning been riding in the beverage cart with her grandfather when she was struck with the errant ball, I might well agree with my colleagues that she was a participant in the outing because her mother consented to the inherent risks of golf to which the grandfather exposed her. But that is not the case we have. Pfenning's mother did not agree that her daughter could attend the outing without her grandfather's supervision or could drive the beverage cart without instruction, in the company of an employee of Whitey's Bar whom she did not know. I do not believe that *Geiersbach v. Frieje,*

807 N.E.2d 114 (Ind.Ct.App. 2004) should be expanded to include the facts of this case.

To me, there may be several levels of participation in a sporting event, and they should not all be treated the same. Although sporting events pose inherent risks, the risks are different for those at different levels of participation. Thus, a batter playing in a baseball game may well be said to have assumed the risk of getting hit with a wild pitch, and a shortstop may assume the risk of being spiked by a runner sliding into second base. A fan watching the game from the stands, however, would not have assumed such risks, but may have assumed the risk of being hit by a foul ball that goes into the stands. Pfenning was not playing golf at the Elks Club when she was injured and should not be said to have assumed the risks inherent to playing golf.

I would reverse the summary judgment in favor of the Elks Club, Whitey's Bar and the Estate of Jerry Jones and remand for further proceedings, and I respectfully dissent from the opinion of my colleagues holding that none of these entities owed a duty of due care to Cassie Pfenning.